FILED
2005 Nov-28  PM 02:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **ELIZABETH HOPSON, as personal** ) | |
| **representative of the estate of** ) | |
| **Alfonzo Hopson, deceased,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil Action No.  CV-03-S-2910-NE** |
| ) | |
| **CITY OF HUNTSVILLE,** ) | |
| **ALABAMA,** *et al.,* ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

This case presents a difficult question:  whether the routine traffic stop of an automobile engaged in transporting plaintiff's decedent to a hospital — initially stopped for a minor equipment violation, but detained (according to the plaintiff) for forty-five minutes while awaiting confirmation of whether there was an outstanding warrant for the driver's arrest — gives rise to cognizable causes of action on behalf of the deceased passenger's estate under 42 U.S.C. § 1983 for either a violation of the Fourth Amendment's prohibition of unreasonable seizures, or a deprivation of life and liberty without due process of law under the Fourteenth Amendment?

On these facts, the observation by Judge Posner of the Seventh Circuit seems particularly apt: "No problem so perplexes the federal courts today as determining the

outer bounds of [Section] 1983, the ubiquitous tort remedy for deprivations of rights secured by federal law (primarily the Fourteenth Amendment) by persons acting under color of state law." *Jackson v. City of Joliet*, 715 F.2d 1200, 1201 (7th Cir. 1983) (Posner, J.).[1]

The plaintiff in this action, Elizabeth Hopson, is the widow and personal representative of the estate of Alfonzo Hopson, deceased.  She also was the driver of the automobile in question.  She filed a complaint in state court alleging that her husband's death was the proximate result of wrongful conduct by the City of Huntsville, Alabama, and two of its police officers, Gary Trampas and Kevin Newey.

---

[1] Section 1983 originally was Section 1 of the Civil Rights Act of 1871, but it "was 'modeled' on § 2 of the Civil Rights Act of 1866, . . . and was enacted for the express purpose of 'enforc[ing] the provisions of the Fourteenth Amendment.'" *Mitchum v. Foster*, 407 U.S. 225, 238-39 (1972) (citations omitted).  The statute provides a means for obtaining monetary compensation from state or municipal governmental entities or officials whose conduct under color of state law deprives a plaintiff of rights, privileges, or immunities secured by the United States Constitution or federal statutes.  In pertinent part, the statute provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  Defendants do not dispute that they are "persons" amenable to suit under this statute, nor that the conduct complained of by plaintiff was committed "under color of state law," but they do contend that there is no evidence of a constitutional violation.

The case was removed here,[2] and now is before the court on defendants' motions for summary judgment.[3]   Accordingly, the facts recited in the following summary are either undisputed, or framed in the light most favorable to plaintiff.  *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding that, when ruling upon a motion for summary judgment,[4] "the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment").[5]

---

[2] *See* doc. no. 1 (notice of removal).

[3] *See* doc. nos. 41 (City's renewed motion for summary judgment), 42 (Trampas's renewed motion for summary judgment), and 43 (Newey's motion for summary judgment).  *See also* doc. nos. 44 (Defendants' Joint Evidentiary Submission in Support of Renewed Motions for Summary Judgment), 45 (Defendants' Joint Brief in Support of Renewed Motions for Summary Judgment), 56 (Defendants' Joint Reply Submission in Support of Renewed Motions for Summary Judgment), 66 (Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment), 67 (Plaintiff's Evidentiary Submission in Opposition to Defendants' Motions for Summary Judgment), 68 (Plaintiff's Evidentiary Submission in Opposition to Defendants' Motions for Summary Judgment) (part II), and 70 (Defendants' Second Joint Reply Submission in Support of Renewed Motions for Summary Judgment).

[4] Federal Rule of Civil Procedure 56 provides, in part, that summary judgment not only is proper, but "*shall be* rendered *forthwith* if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c) (emphasis supplied).  Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

[5] As discussed *infra*, the individual defendants pled a qualified immunity defense to the federal claims asserted against them in their individual capacities.  Accordingly, the requirement for this court to resolve all disputed issues of material fact in favor of plaintiff assumes a heightened significance.  *See Saucier v. Katz*, 533 U.S. 204, 201 (2001) ("A court required to rule upon the qualified immunity issue must consider . . . this threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officers conduct violated a constitutional right?").

# I. FACTUAL BACKGROUND

Alfonzo Hopson had a history of serious medical problems.  He was diagnosed with end-stage renal disease in 2001, and placed on hemodialysis after developing congestive heart failure.  He was hospitalized during the summer of 2001 for recurring pancreatitis, and was not discharged until September 7, 2001, following surgery and a protracted hospital stay to treat his pancreatitis.[6]  Two weeks following his discharge, and during the late evening hours of September 20, 2001, Mr. Hopson began to experience symptoms of dizziness, sweating, and vomiting.[7]  Plaintiff recognized that her husband needed medical attention, but rather than dialing the "911" emergency operator for an ambulance, she elected to drive her husband to the emergency room of Huntsville Hospital.[8]

Defendant Gary Trampas, a uniformed police officer employed by the City of Huntsville's Police Department, was on duty that evening.[9]  He was accompanied by Jan Cherrie, a so-called "domestic violence responder," who had been assigned to ride with him.  Officer Trampas was monitoring traffic along a section of Drake Avenue

---

[6] Doc. no. 67 (Plaintiff's Evidentiary Submission), Ex. 3 at 11 (September 21, 2001 medical report completed by Todd A. Broome, M.D.).

[7] *See* doc. no. 44 (Defendants' Evidentiary Submission), Ex. C (Affidavit of Tracy Moseley), ¶ 6 (symptoms began approximately three to four hours before 1:53 o'clock a.m., September 21, 2001); doc. no. 67 (Plaintiff's Evidentiary Submission), Ex. 2 (Affidavit of Elizabeth Hopson).

[8] *See* doc. no. 67 (Plaintiff's Evidentiary Submission), Ex. 2, Hopson affidavit, at 1.

[9] Doc. no. 44 (Defendants' Evidentiary Submission), Ex. A, Trampas Affidavit, ¶ 2.

between Cobb Road and Ivy Street when he observed a vehicle without a light illuminating the rear license plate.[10]  He pulled behind the vehicle and activated his blue lights.  Plaintiff moved to the shoulder of the road and stopped her automobile. She says the time was "approximately 12:45 a.m."[11]

Before exiting his patrol car, Officer Trampas radioed the police department's dispatch operator, to report his location and the make, model, color, and tag number of plaintiff's automobile.[12]  On his initial approach to plaintiff's vehicle Trampas observed that she was seated in the driver's position, and an adult male, later identified as Mr. Hopson, was "sitting in the passenger seat with a small white plastic garbage can between his legs."[13]  Trampas informed plaintiff that she had been stopped because her automobile did not have a light illuminating the rear registration plate, and asked to see her driver's license, proof of insurance, and vehicle registration.[14]  Plaintiff complied with his requests, but also told Officer Trampas that

---

[10] *Id.*, ¶ 3.

[11] Doc. no. 67 (Plaintiff's Evidentiary Submission), Ex. 2, Hopson affidavit, at 1.  This evidence is disputed.  Defendants contend that the stop occurred sometime between 1:18 o'clock a.m. and 1:20 o'clock a.m., over a half hour later.  *See, e.g.,* doc. no. 44 (Defendants' Evidentiary Submission), Ex. A, Trampas affidavit, ¶ 4 (stop occurred at "approximately 1:20 o'clock a.m."); *id.*, Ex. F, Affidavit Testimony of Jeni Batt, at 2 (according to Huntsville Police Department records, "[a]t 1:18:03 o'clock a.m., Officer Gary Trampas radioed the [Huntsville Police Department] dispatcher . . . to report that he was effecting a traffic stop of a vehicle at the intersection of Drake Avenue and Iv[y] Avenue").

[12] Doc. no. 44, Ex. A, Trampas affidavit, ¶ 4.

[13] *Id.*, ¶ 6.

[14] *Id.*, ¶ 5.

her husband was experiencing dizziness, vomiting, and sweating, and that he "had just been released from Huntsville Hospital a day or so earlier."[15]  She asked Trampas to allow her to proceed to the emergency room, but he "refused."  Plaintiff then asked Trampas to transport her husband to the hospital, or call for an ambulance, but he again "refused to help, or even to call an ambulance."[16]

Instead, Trampas returned to his patrol car and radioed the police department's Records Division (not the dispatcher), and requested a background check of plaintiff's driver's license.[17]  He was advised that her "license" actually was a learner's permit, and that there possibly was an outstanding warrant for her arrest.  Trampas was told to wait while the status of the warrant was verified.[18]

Officer Trampas returned to plaintiff's vehicle, and advised her that he would not be able to let her depart.  He later described this sequence of events as follows:

> After re-approaching Mrs. Hopson's vehicle, I asked Mrs. Hopson if she knew her license was only a learner's license, to which she replied "yes."  I then asked Mr. Hopson if he had a current driver's license, to which he replied that he did not.  Although I did not tell Mrs. Hopson about the possible arrest warrant at this time, I informed Mrs. Hopson that I would not be able to let her drive away because neither she nor Mr.

---

[15] Doc. no. 67, Ex. 2, Hopson affidavit, at 1.

[16] *Id.*, at 1-2.  This evidence is disputed.  Officer Trampas attests that when he approached plaintiff's vehicle, he asked Mr. Hopson whether he wanted an ambulance summoned, to which Mr. Hopson replied "no."  *See* doc. no. 44 (Defendants' Joint Evidentiary Submission), Ex. A, Trampas affidavit, ¶¶ 6, 8, 9.

[17] Doc. no. 44 (Defendants' Joint Evidentiary Submission), Ex. A, Trampas affidavit, ¶ 7.

[18] *Id.*

Hopson had a driver's license.[19]

Plaintiff states that she "repeatedly begged Officer Travis [sic] to get my husband to the hospital," but he "refused."[20]

Instead, Officer Trampas again returned to his patrol car and transmitted another radio communication to the Records Division.  He asked about the arrest warrant, but was instructed to "standby," because the background check was still in progress.[21]  He walked back to plaintiff's vehicle, spoke with Mr. Hopson,[22] and returned to his patrol car a third time.[23]

Defendant Kevin Newey, another uniformed officer employed by the Huntsville Police Department, also was on duty that morning.[24]  Sometime before 1:30 a.m., he was advised by the department's dispatcher that another officer had made a traffic stop

---

[19] *Id.*, ¶ 8.  According to Officer Trampas, he also asked plaintiff "if there was someone that could be called to transport Mr. Hopson to the hospital, to which [plaintiff] replied 'no.'" *Id.*  Officer Trampas also attests that he asked Mr. Hopson whether he could summon an ambulance for him, to which Mr. Hopson replied "no."  *Id.*  These facts are disputed.  According to plaintiff, Officer Trampas "did not ask me if there were someone who could be called to transport my husband to the hospital."  Doc. no. 67 (Plaintiff's Evidentiary Submission), Ex. 2, Hopson affidavit, at 2.  Plaintiff also responds that Officer Trampas "did not ask my husband if he wanted an ambulance; and my husband never told him that he did not need, nor want an ambulance."  *Id.*

[20] Doc. no. 67 (Plaintiff's Evidentiary Submission), Ex. 2, Hopson affidavit, at 1.

[21] Doc. no. 44 (Defendants' Evidentiary Submission), Ex. A, Trampas affidavit, ¶ 9.

[22] Officer Trampas attests that he asked Mr. Hopson whether he wanted an ambulance summoned, to which Mr. Hopson replied "no."  *Id.*  Plaintiff responds that Officer Trampas "did not ask my husband if he wanted an ambulance; and my husband never told him that he did not need, nor want an ambulance."  Doc. no. 67 (Plaintiff's Evidentiary Submission), Ex. 2, Hopson affidavit, at 2.

[23] Doc. no. 44 (Defendants' Evidentiary Submission), Ex. A, Trampas affidavit, ¶ 9.

[24] *Id.*, Ex. B, Affidavit Testimony of Kevin Newey, ¶ 2.

near Drake Avenue and Ivy Street, and he was instructed to drive to that location to provide backup, if assistance was needed.[25]  Officer Newey exited his patrol car and conferred with Officer Trampas, who told him that the vehicle had been stopped for not having a light illuminating the rear tag, but that neither the driver nor passenger possessed a valid driver's license, and he also was awaiting verification of a possible warrant for plaintiff's arrest.[26]

Officer Newey then approached the passenger side of plaintiff's automobile and observed that Mr. Hopson had a bucket, either tucked in his lap or on the floor of the vehicle.  Newey asked Mr. Hopson how he was feeling, and Mr. Hopson responded that he felt nauseous.[27]  Although plaintiff does not identify Officer Newey by name, she recalled that

> [f]rom the time of my stop . . . I repeatedly told the *Officers* that my husband was gravely ill and that I was trying to get him to the hospital for emergency treatment, and I begged *them* to either take him to the hospital, or to let me take him.  I also told *them* that he was dizzy, vomiting, and so weak that he could barely walk.  In fact, he vomited in *their* presence.[28]

Despite this, "the *Officers* did not take [plaintiff's] husband to the hospital, nor permit

---

[25] *Id.*, ¶ 3.

[26] *Id.*, ¶ 4.

[27] *Id.*, ¶ 5.

[28] Doc. no. 67 (Plaintiff's Evidentiary Submission), Ex. 7, Affidavit of Claim, at 1 (emphasis supplied).

[her] to take him to the hospital, nor immediately summon an ambulance."[29]

Officer Newey returned to Officer Trampas's patrol car.[30]  Later, Officer Newey approached plaintiff's vehicle a second time,[31] spoke with Mr. Hopson,[32] and returned to Officer Trampas's vehicle.[33]

Following Officer Newey's arrival, Jan Cherrie, the "domestic violence responder" accompanying Officer Trampas, exited the patrol car and approached plaintiff's vehicle.  She observed that Mr. Hopson was "hunched over a waste paper basket," and that he "looked clammy and pale."[34]  She asked plaintiff whether she could provide any assistance to her husband, but plaintiff "declined."[35]

Sometime thereafter, the Records Division advised Officer Trampas that "the arrest warrant for Mrs. Hopson had been confirmed through the MCSD [Madison County Sheriff's Department] and that the MCSD wanted the arrest warrant to be

---

[29] *Id.* This evidence is disputed.  Officer Newey attests that when he approached plaintiff's vehicle, he asked Mr. Hopson whether he wanted an ambulance summoned, to which Mr. Hopson replied "no."  Doc. no. 44 (Defendants' Evidentiary Submission), Ex. B, Newey affidavit, ¶¶ 5, 6.

[30] Doc. no. 44 (Defendants' Evidentiary Submission), Ex. B, Newey affidavit, ¶ 5.

[31] *Id.*, ¶ 6.

[32] Officer Newey attests that he asked Mr. Hopson whether he wanted an ambulance summoned, to which Mr. Hopson replied "no."  *Id.*  Plaintiff responds that "neither Alfonzo[ ] nor I ever told any Officer that he was okay, or alright, or that he did not need, or did not want an ambulance.  Neither of us refused any offers of help; and no offers of help were made to either of us by any of the Officers."  Doc. no. 67 (Plaintiff's Evidentiary Submission), Ex. 2, Hopson affidavit, at 2.

[33] Doc. no. 44 (Defendants' Evidentiary Submission), Ex. B, Newey affidavit, ¶ 6.

[34] *Id.*, Ex. D, Affidavit Testimony of Jan Cherrie, ¶ 7.

[35] *Id.*

9

executed on Mrs. Hopson."[36]   Trampas asked "what the arrest warrant was for, and was told it was for possession of dangerous drugs or something to that effect."[37]   He and Officer Newey then approached plaintiff's vehicle for the last time.   Trampas informed plaintiff there was an outstanding warrant for her arrest.[38]   When plaintiff asked what the warrant was for, Trampas replied that "the warrant had something to do with possession of dangerous drugs and that the deputy (referring to a MCSD deputy) would be able to explain it to her better" when they reached the jail.[39]   Officer Newey advised Mr. Hopson that he would call for an ambulance to transport him to the hospital, and he radioed the dispatcher for that purpose.[40]

Emergency medical technicians and an ambulance were dispatched at "approximately 1:30 o'clock a.m.,"[41] and arrived on the scene seven minutes later, at 1:37 a.m.[42]   Mr. Hopson exited his automobile and "walked to the ambulance under his own power, although he was somewhat unsteady on his feet."[43]   He complained to Tracy Mosely, one of the attending paramedics, that he was dizzy and had been

---

[36] Doc. no. 44 (Defendants' Evidentiary Submission), Ex. A, Trampas affidavit, ¶ 11.

[37] *Id.*   The actual charge on which plaintiff was arrested was unlawful possession of controlled substances, a Class C felony under Alabama law.   *See* Ala. Code § 13A-12-212 (1975).

[38] Doc. no. 44 (Defendants' Evidentiary Submission), Ex. A, Trampas affidavit, ¶ 12.

[39] *Id.*

[40] *Id.*, Ex. B, Newey affidavit, ¶ 8.

[41] *Id.*, Ex. C, Mosely affidavit, ¶ 4.

[42] *Id.*

[43] *Id.*, ¶ 5.

10

vomiting, and Mosely observed that Mr. Hopson was "suffering from a somewhat decreased mental status."[44]  The ambulance departed for Huntsville Hospital at 1:53 a.m.  Although Mr. Hopson vomited en route, the paramedics did not activate the ambulance's emergency lights or siren, because they did not believe his condition to be life threatening.[45]  Plaintiff was not permitted to accompany her husband to the hospital.  Instead, Officer Trampas transported her to the Madison County jail.[46]

Mr. Hopson was admitted to Huntsville Hospital at 2:05 a.m.[47]  Upon arrival, he was "very confused, drowsy, and deteriorated to the point where he had [ ] snoring type respirations."[48]  Within hours, it was determined that he had suffered a cerebellar hemorrhage.[49]  His condition progressively worsened from "rapid neurologic deterioration" to coma and, ultimately, brain death.[50]  Mr. Hopson was pronounced dead at 10:40 a.m. on September 22, 2001, two days after this incident.[51]

---

[44] *Id.*, ¶ 6.

[45] *Id.*, ¶ 7.

[46] Doc. no. 44 (Defendants' Evidentiary Materials), Ex. A, Trampas affidavit, ¶ 14.

[47] Doc. no. 67 (Plaintiff's Evidentiary Submission), Ex. 3 at 3 (Huntsville Hospital System Initial Admission Assessment).

[48] *Id.* at 13 (report of Robert L. Hash, M.D.).

[49] *Id.*

[50] *Id.* at 6 (report of Todd A. Broome, M.D.).

[51] *Id.*, Ex. 4 (Alabama Certificate of Death).

## II. DISCUSSION

Plaintiff asserts both official and personal ("individual") capacity claims against Officers Gary Trampas and Kevin Newey.[52]  The distinction was summarized by the Supreme Court in *Kentucky v. Graham*, 473 U.S. 159 (1985), as follows:

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.  It is *not* a suit against the official personally, for the real party in interest is the entity.  Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

*Id*. at 166 (emphasis in original) (citations, footnotes, and internal quotation marks omitted).

In addition to her claims against Officers Trampas and Newey, plaintiff sues the City of Huntsville.  As suggested in the preceding quotation from *Graham*, her official capacity claims are redundant.  *See also, e.g., McMillian v. Monroe County*, 520 U.S. 781, 785 n.2 (1997) (stating that a suit against a governmental officer in his official capacity is the same as a suit against the entity of which the officer is an agent, and that victory in an official-capacity suit imposes liability on the entity the officer

---

[52] *See* doc. no. 30 (Third Amended Complaint) ¶¶ 2, 22.

represents) (citations omitted).  Accordingly, those claims are due to be dismissed.
*See*, *e.g.*, *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("Because
suits against a municipal officer sued in his official capacity and direct suits against
municipalities are functionally equivalent, there no longer exists a need to bring
official-capacity actions against local government officials, because local government
units can be sued directly (provided, of course, that the public entity receives notice
and an opportunity to respond).") (citations omitted).

Addressing plaintiff's individual capacity claims, Officers Trampas and Newey
deny that they violated any rights secured to plaintiff's decedent by the Fourth and
Fourteenth Amendments.  Alternatively, each defendant contends that, even if his
conduct violated federal law, he still is entitled to "qualified immunity" from both suit
and liability.

The doctrine of qualified immunity provides "complete protection for
governmental officials sued in their individual capacities as long as 'their conduct
violates no clearly established statutory or constitutional rights of which a reasonable
person would have known.'"  *Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir.
2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "The purpose of this
immunity is to allow government officials to carry out their discretionary duties
without the fear of personal liability or harassing litigation, protecting from suit all but

the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (citations and internal quotation marks omitted).

Before they may claim the benefits of this defense, Officers Trampas and Newey must prove, as an initial matter, that each "was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988)). In other words, if either of the individual defendants "was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity." *Lee*, 284 F.3d at 1194. The Eleventh Circuit's decision in *Courson*, *supra*, provides a basis for determining whether Officers Trampas and Newey were engaged in the performance of discretionary functions.

In that case, an automobile occupied by Sharon Courson and two male companions was stopped by a deputy sheriff for speeding. One of the males became, and continued to be, verbally abusive and belligerent; he also challenged the deputy's authority to conduct the stop. Because the deputy was outnumbered by the three occupants of the stopped vehicle, and also because he was uncertain whether they had been involved in criminal activity,[53] he removed a shotgun from his patrol car and

---

[53] The deputy sheriff who effected the stop and subsequent arrests of the male occupants had been conducting surveillance of marijuana fields earlier that evening, and had noticed "a dark,

instructed them to lie face down on the ground while he awaited assistance.  939 F.2d at 1482-83.  "Including the wait for backup assistance . . . the total time that Courson remained on the ground was approximately thirty minutes."  *Id*. at 1484.  The two male occupants of the vehicle ultimately were arrested,[54] but Sharon Courson was not. She nevertheless brought suit against the deputy sheriff under § 1983, alleging, in part, that her detention constituted an unreasonable seizure under the Fourth and Fourteenth Amendments.  The deputy pled qualified immunity as an affirmative defense, and the Eleventh Circuit considered three factors in determining whether he was acting within the scope of his discretionary authority:  (*i*) whether he was on duty at the time of the stop; (*ii*) whether he had probable cause to initiate the stop; and (*iii*) whether the post-stop arrests of Courson's companions were lawful.  *See id*. at 1488.

   All elements of the *Courson* test are satisfied in the present case.  Officers Trampas and Newey were on duty at the time plaintiff's automobile was stopped. Plaintiff admits that her automobile did not have a light illuminating the rear registration plate;  therefore, Officer Trampas had probable cause to initiate the stop.

---

four-wheel drive vehicle, similar to the one that passed him and contained Courson and her companions, in the vicinity of the cultivated marijuana fields.  He activated his siren and flashing blue light, and pursued the vehicle."  *Courson v. McMillian*, 939 F.2d 1479, 1482-83 (11th Cir. 1991).

   [54] "The male driver was charged with driving under the influence of alcohol, speeding, and with fleeing and attempting to elude a law enforcement officer.  The other male, who physically resisted arrest and injured one of the officers, was charged with resisting arrest with violence, disorderly intoxication, obstruction of justice, assault on law enforcement officers, and battery on a police officer."  *Id*. at 1483-84.

Finally, plaintiff does not challenge the validity of her arrest on the outstanding warrant.

Accordingly, the burden of production and persuasion shifts to plaintiff to show that qualified immunity is not appropriate under the circumstances of this case. *See*, *e.g.*, *Travers v. Jones*, 323 F.3d 1294, 1295 (11th Cir. 2003) ("Once the defendants established that they were acting within their discretionary authority . . . the burden shifted to the plaintiff to show that qualified immunity is inappropriate."); *Lee*, 284 F.3d at 1194 (same).

A plaintiff shoulders that burden by satisfying both elements of the two-part test defined by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001). "A court required to rule upon the qualified immunity issue must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Id*. at 201 (citing *Siegert v. Gilley*, 500 U.S. 266, 232 (1991)); *see also id*. at 200 ("[T]he first inquiry must be whether a constitutional would have been violated on the facts alleged.").

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific

context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.

*Id*. at 201; *see also Lee*, 284 F.3d at 1194 (same).

## A.   Violation of the Fourteenth Amendment?

No provision of the United States Constitution *expressly* guarantees individuals a right to medical care by governmental entities; instead, such rights have been *inferred* from the Eighth and Fourteenth Amendments.  The seminal case is *Estelle v. Gamble*, 429 U.S. 97 (1976), in which the Supreme Court interpreted the Eighth Amendment's proscription against "cruel and unusual punishments" and, for the first time, held that governments had an "obligation to provide medical care *for those whom it is punishing by incarceration*."  *Id*. at 103 (emphasis supplied).

An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.  In the worst cases, such a failure may actually produce physical torture or a lingering death, the evils of most immediate concern to the drafters of the Amendment.  In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose.  The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that "(i)t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."

We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.  This is true whether the indifference is manifested by prison doctors in their response

> to the prisoner's needs[,] or by prison guards in intentionally denying or delaying access to medical care[,] or intentionally interfering with the treatment once prescribed.  Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

*Id*. at 103-05 (citations, footnotes, and some internal quotation marks omitted).  Cases grounded in the Eighth Amendment extend only to prison inmates and persons who have been convicted and sentenced, but not yet transferred to a penitentiary.  *See Ingraham v. Wright*, 430 U.S. 651, 671 n. 40 (1977) ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.").

The Supreme Court later determined that the substantive component of the Due Process Clause of the Fourteenth Amendment required state governments to provide medical care for persons who have been involuntarily committed to state institutions, such as a facility for the mentally retarded.  *See Youngberg v. Romeo*, 457 U.S. 307, 317 (1982) ("When a person is institutionalized [and becomes] wholly dependent on the State . . . a duty to provide certain services and care does exist.").[55]  The sqme logic extends to persons "injured while being apprehended by the police."  *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244 (1983).  "In fact, the

---

[55] *Youngberg* observed in *dicta* that the "mere fact that Romeo has been committed under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment.  Indeed, the state concedes that respondent has a right to adequate food, shelter, clothing, *and medical care*."  457 U.S. at 315 (citation and footnote omitted) (emphasis supplied).

due process rights of a person [who has been injured during the course of an arrest] are at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id*. (citation and footnote omitted).

The Eleventh Circuit has extended the Supreme Court's substantive due process jurisprudence to pre-trial detainees. *See, e.g., Lancaster v. Monroe County*, 116 F.3d 1419, 1425 & n.6 (11th Cir. 1997); *Thomas v. Town of Davie*, 847 F.2d 771, 772 (11th Cir. 1988); *Aldridge v. Montgomery*, 753 F.2d 970, 972 (11th Cir. 1985).

The rationale for all of these decisions, regardless of whether they are grounded in the Eighth Amendment (for convicted inmates), or the Due Process Clause of the Fourteenth Amendment (for all other persons involuntarily committed to some custodial facility), was explained by the Supreme Court in *DeShaney v. Winnebago County Dep't. of Social Services*, 489 U.S. 189 (1989):

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. . . .  In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf — through incarceration, institutionalization, or other similar restraint of personal liberty — which is the "deprivation of liberty" triggering the protections of the Due Process Clause . . . .

*Id*. at 200 (citing *Estelle*, 429 U.S. at 103-04; *Youngberg*, 457 U.S. at 315-16).

The act that gives rise to a cause of action under the rationale of these cases is

19

"deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 104.

The precondition for imposing liability is "*the fact of incarceration*:  the prisoner cannot get his own care, nor can anyone from outside the jail get to him to help him." *Marsh v. Butler County*, 268 F.3d 1014, 1038 (11th Cir. 2001) (*en banc*) (emphasis supplied).[56]

In summary, therefore, plaintiff's Fourteenth Amendment claim actually folds into her Fourth Amendment claim, because any right that her decedent had to receive prompt medical attention requires this court to find:  first, that Mr. Hopson was in custody (*i.e.*, that his detention on the occasion leading to this suit was the functional equivalent of an arrest); and, second, that Officers Trampas and Newey were deliberately indifferent to his serious medical needs.

## B.    Violation of the Fourth Amendment?

The Fourth Amendment provides that "[t]he right of the people to be secure in *their persons*, houses, papers, and effects, against *unreasonable* searches and *seizures*, shall not be violated . . . ."  U.S. Const. amend. IV (emphasis supplied).  As the emphasized words clearly indicate, the Fourth Amendment protects "persons," not

---

[56] *See also Marsh*, 268 F.3d at 1038 ("In 1989, the Supreme Court restated this rationale — *the importance of confinement* — in *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), a Fourteenth Amendment case.  The Court wrote '[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, *but from the limitation which it has imposed on his freedom to act on his own behalf*.'  *Id*. at 1005-06.") (emphasis supplied).

places and things.  *Katz v. United States*, 389 U.S. 347, 351 (1967) (holding that "the Fourth Amendment protects people, not places"); *see also United States v. Puglisi*, 723 F.2d 779, 786 (11th Cir. 1984) (observing that the Fourth Amendment "applies to places and things only when people have reasonable privacy or possessory interests in them.").

Furthermore, "[t]his inestimable right of personal security belongs as much to *the citizen on the streets of our cities* as to the homeowner closeted in his study to dispose of his secret affairs."  *Terry v. Ohio*, 392 U.S. 1, 8-9 (1968) (emphasis supplied); *see also Delaware v. Prouse*, 440 U.S. 648, 663 (1979) ("As *Terry* . . . recognized, people are not shorn of all Fourth Amendment protection when they step from their homes on the public sidewalks.  *Nor are they shorn of those interests when they step from the sidewalks into their automobiles*.") (emphasis supplied).

It should come as no great surprise to find, therefore, that routine traffic stops may result in a Fourth Amendment "seizure" of drivers and passengers alike.  *See Whren v. United States*, 517 U.S. 806, 809-10 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision.") (citations omitted); *Prouse*, 440 U.S. at 653 ("[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning

of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief.") (citations omitted).

The question on which analysis turns, however, is *not* whether the traffic stop at issue here resulted in a "seizure" of plaintiff's decedent, because it unquestionably did. "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk [or *drive*] away, he has 'seized' that person." *Terry*, 393 U.S. at 16;[57] *see also*, *e.g.*, *United States v. Hensley*, 469 U.S. 221, 226 (1985) ("[S]topping a car and detaining its occupants constitute a seizure within the meaning of the Fourth Amendment."); *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996) ("A routine traffic stop is a seizure within the meaning of the Fourth Amendment.").

Plaintiff's decedent did not have a valid driver's licence on his person and, therefore, could not legally drive himself to the hospital.  Even if he had, he was too ill to leave the scene unaided.  Under these circumstances, plaintiff's decedent was "seized" within the meaning of the Fourth Amendment, because he was not free to proceed to Huntsville Hospital until such time as Officer Trampas released his wife, or one of the officers on the scene either transported him to the hospital, or called for

---

[57] *But see Terry*, 392 U.S. at 19 n.16 ("Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons.  Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.").

an ambulance to do so.  *See Courson*, 939 F.2d at 1482-84, 1488 (holding that passenger Sharon Courson was seized, "because she was not free to go until [the officer] so informed her").  *Cf. United States v. Willis*, 759 F.2d 1486, 1495 (11th Cir. 1985) ("A stop becomes a seizure when, under all the circumstances of the intrusion, a reasonable, ordinary person in the suspect's position would believe he is not free to leave.").[58]

The pivotal question for purposes of Fourth Amendment analysis, therefore, is whether the detention of plaintiff's decedent was "unreasonable."  *See, e.g., Whren*, 517 U.S. at 810 ("An automobile stop is . . . subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."); *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989) ("'Seizure' alone is not enough for § 1983 liability; the

---

[58] The Fifth and Tenth Circuits have indicated that a passenger is seized the moment the vehicle is stopped.  *See United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003) (holding that a vehicle passenger had standing to challenge a traffic stop because "a stop results in the seizure of the passenger and driver alike") (citations and internal marking omitted; emphasis deleted); *United States v. Erwin*, 875 F.2d 268, 270 (10th Cir. 1989) (holding that a vehicle passenger had standing to challenge a traffic stop, and rejecting "any notion that a vehicular stop detains for Fourth Amendment purposes *only* the driver simply because the passenger may be free to depart") (emphasis in original) (citing *Berkemer v. McCarty*, 468 U.S. 420, 436 (1984) ("It must be acknowledged at the outset that a traffic stop significantly curtails the 'freedom of movement' of the driver and the passengers, if any, of the detained vehicle.") (stated in the context of deciding whether the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered "custodial interrogation" for purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966)).  The Sixth Circuit has held that the seizure of a vehicle passenger occurs after the stop is made, when the driver of the vehicle is not permitted to leave.  *See United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) ("When the driver is not free to leave, neither are his passengers; indeed, the passengers are at the mercy of any police officer who is withholding the return of their driver.") (citations omitted).

seizure must be 'unreasonable.'"); *United States v. Sharpe*, 470 U.S. 675, 682 (1985) ("The Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures.") (emphasis in original); *Elkins v. United States*, 364 U.S. 206, 222 (1960) (same).

The reasonableness inquiry is shaped by "all the circumstances of this on-the-street encounter." *Terry*, 392 U.S. at 9.[59]  In determining whether the seizure was "unreasonable," the court's "inquiry is a dual one — whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. at 19-20; *see also United States v. Jones*, 44 F.3d 860, 871 (10th Cir. 1995) ("Under *Terry*, the actions of the police must be justified at their inception and reasonably related to the circumstances which originally justified their interference.").

---

[59] This quotation is taken from the following passage in Chief Justice Warren's opinion for the Court in *Terry*:

> Of course, the specific content and incidents of [a person's right to be free from unreasonable governmental intrusion] must be shaped by the context in which it is asserted.  For what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.  Unquestionably petitioner was entitled to the protection of the Fourth Amendment as he walked down the street in Cleveland.  The question is whether in all the circumstances of this on-the-street encounter, his right to personal security was violated by an unreasonable search and seizure.

*Terry v. Ohio*, 392 U.S. 1, 9 (1968) (citations and internal quotation marks omitted); *see also id.* at 17 n. 15 ("In our view the sounder course is to recognize that the Fourth Amendment governs all intrusions by agents of the public upon personal security, *and to make the scope of the particular intrusion*, *in light of all the exigencies of the case*, *a central element in the analysis of reasonableness*.") (emphasis supplied) (citations omitted).

24

### 1.     Inception of stop

A traffic stop "is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (*en banc*).

There is no dispute that plaintiff's vehicle lacked a light illuminating the rear registration plate.  Accordingly, Officer Trampas possessed probable cause to initiate the stop.  *See* Ala. Code § 32-5-240(c)(3) (1975) ("Every motor vehicle shall have a tail lamp or a separate lamp so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of 50 feet to the rear.").[60]

Further, after being advised by the police department's Records Division (reliably, as it turns out) of the possibility of an outstanding warrant for plaintiff's arrest, Officer Trampas also had a reasonable suspicion, based upon specific and articulable facts, that justified detaining plaintiff beyond the period necessary to verify her license information and write a traffic citation.  *Compare United States v. Hensley*, 469 U.S. 221, 229 (1985) (observing that, "if police have a reasonable suspicion,

---

[60] *See Delaware v. Prouse*, 440 U.S. 648, 658 (1979) ("We agree that the States have a vital interest in insuring that only those qualified to do so are permitted to operate motor vehicles, that those vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed.") (emphasis supplied).

grounded in specific and articulable facts, that a person they encounter . . . is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion"), *with United States v. Luckett*, 484 F.2d 89 (9th Cir. 1973) (holding that, when officers who observed defendant jaywalking had obtained identification and executed a traffic citation, it was unreasonable under the Fourth Amendment to extend the detention for the purpose of conducting a warrant search, because the officers had no reasonable grounds to be suspicious of the existence of an outstanding warrant).

Moreover, and despite defendants' concession that "Mr. Hopson was never arrested or even suspected of any wrongdoing,"[61] the probable cause that justified stopping plaintiff in the first instance, and the reasonable suspicion that supported extension of her detention beyond the time necessary to verify her license information and write a traffic citation, extended to her decedent, who was a passenger in the automobile. *See Hensley*, 469 U.S. at 226 ("Although stopping a car *and detaining its occupants* constitute a seizure within the meaning of the Fourth Amendment, the governmental interest in investigating an officer's reasonable suspicion, based on specific and articulable facts, may outweigh the Fourth Amendment interest of the driver *and passengers* in remaining secure from the intrusion.") (emphasis supplied)

---

[61] Doc. no. 45 (Defendants' Joint Brief), at 44-45.

(citing *Prouse*, 440 U.S. at 653-55).

Therefore, the detention of plaintiff and her decedent was justified at its inception. *Whren*, 517 U.S. at 810 ("[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

### 2.    Scope of intrusion on the liberty of plaintiff's decedent

Nevertheless, a search or seizure that is justified at its inception still may violate the Fourth Amendment "*by virtue of its intolerable intensity and scope*"; indeed, the scope of the search or seizure "must be *strictly tied to and justified by the circumstances which rendered its initiation permissible.*"  *Terry*, 392 U.S. at 17-18 (emphasis supplied) (citations and internal quotation marks omitted).

The question of whether a particular seizure was reasonably related in scope to the circumstances that justified curtailment of an individual's freedom must be judged by an objective standard:  "would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?"  *Id*. at 21-22 (citations, footnotes, and internal quotation marks omitted); *see also Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *Prouse*, 440 U.S. at 654 ("[T]he reasonableness standard usually requires, at a minimum, that the

27

facts upon which an intrusion is based be capable of measurement against an 'objective standard,' whether this be probable cause or a less stringent test.") (footnotes omitted).[62]

Focusing first on the length of the detention — a period of some forty-five minutes according to plaintiff's account of the facts — one finds, as a general proposition, that "detention of a motorist pursuant to a traffic stop is presumptively temporary and brief," and that "the vast majority of roadside detentions last only a few minutes." *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984).

Even so, there are no hard and fast time limitations.[63] Cases have determined detentions of five-to-ten minutes,[64] twenty minutes,[65] twenty-five minutes,[66] thirty minutes,[67] forty-five minutes,[68] fifty minutes,[69] and even seventy-five minutes[70] to be

---

[62] *Accord Arkansas v. Sullivan*, 532 U.S. 769, 772 (2001) (*per curiam*).

[63] *See United States v. Sharpe*, 470 U.S. 675, 685 (1985) ("Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.").

[64] *United States v. Contreras-Diaz*, 575 F.2d 740, 744-45 (9th Cir. 1978).

[65] *United States v. Sharpe*, 470 U.S. 675, 685 (1985).

[66] *United States v. Willis*, 759 F.2d 1486, 1497 (11th Cir. 1985) ("The relative brevity of this stop distinguishes this case from those involving much longer periods of seizure.") (citations omitted).

[67] *Courson v. McMillian*, 939 F.2d 1479, 1491-92 (11th Cir. 1991); *see also United States v. Shareef*, 100 F.3d 1491, 1501-02 (10th Cir. 1996) ("Although a driver who is not carrying a license may not be detained indefinitely, a detention of thirty minutes, given the totality of the circumstances present here, was reasonable.") (footnote omitted).

[68] *United States v. Borys*, 766 F.2d 304, 311 (7th Cir. 1985) (addressing detention of defendant in Chicago's O'Hare Airport, and stating: "Although Borys spent forty-five minutes in the airport from the time he deplaned until he finally left, the time during which the agents questioned him was quite brief. Continual interrogation for forty-five minutes would present a

reasonable.  Only considerably longer periods — *e.g.*, ninety minutes,[71] and 140

minutes[72] — have been declared "unreasonable."  Thus, even according to plaintiff's

account of the facts, this court cannot say that the length of detention was

unreasonable.

Another component of the reasonableness evaluation, however, is whether

police officers diligently pursued their inquiry.  *Cf. United States v. Place*, 462 U.S.

696, 709 (1983) (holding, in the context of an airport seizure of defendant's luggage

for a period of ninety minutes, that "in assessing the effect of the length of the

detention, we take into account whether the police diligently pursue their

investigation"); *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion holding,

also in the context of an airport seizure and search of luggage for narcotics, that "an

investigative detention must be temporary and last no longer than is necessary to

effectuate the purpose of the stop").

---

completely different picture from the sporadic questioning spanning three-quarters of an hour at issue here.") (citing *Florida v. Royer*, 460 U.S. 491, 502-03 (1983)).

[69] *United States v. Hardy*, 855 F.2d 753, 761 (11th Cir. 1988); *United States v. Alpert*, 816 F.2d 958 (4th Cir. 1987).

[70] *United States v. Borys*, 766 F.2d 304, 312-13 (7th Cir. 1985) (addressing the length of agents' seizure of defendant's luggage in an airport terminal, and stating that "[c]learly the seventy-five-minute detention involved here, if permissible at all, is at the outer bounds of the Consitution").

[71] *United States v. Place*, 462 U.S. 696, 709 (1983) (addressing the ninety minute detention of defendant's luggage that transpired while agents transported the bags from LaGuardia Airport, where defendant had been questioned, to Kennedy Airport, where a narcotics-detection dog was available, and holding that "[t]he length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause").

[72] *United States v. Puglisi*, 723 F.2d 779 (11th Cir. 1984).

Delay in confirming whether there was an outstanding warrant for plaintiff's arrest was not due to Officer Trampas's failure to diligently pursue the inquiry, but instead to the fact that the police Records Division had to contact a separate law-enforcement entity, the Madison County Sheriff's Department, to obtain confirmation. As such, at least a portion of the detention here is analogous to the one-hour stop sanctioned by the Tenth Circuit in *United States v. Rutherford*, 824 F.2d 831, 834 (10th Cir. 1984) (upholding one-hour investigative stop when nearly half of that detention was caused by problems with the police computer).

The court also notes that neither plaintiff nor her decedent were removed from the vehicle in which they were riding, handcuffed, or questioned continually. *Cf. United States v. Borys*, 766 F.2d 304, 311 (7th Cir. 1985) ("Although Borys spent forty-five minutes in the airport from the time he deplaned until he finally left, the time during which the agents questioned him was quite brief. Continual interrogation for forty-five minutes would present a completely different picture from the sporadic questioning spanning three-quarters of an hour at issue here.").

Accordingly, even when viewed "in the light most favorable to the party asserting the injury," the court cannot say that defendants' conduct violated the Fourth Amendment's prohibition against "unreasonable" seizures.

Moreover, because an ambulance was summoned to the scene, even if not as

30

quickly as plaintiff desired, she has not established that Officers Trampas and Newey were "deliberately indifferent" to her decedent's serious medical needs.

## C.   "Clearly Established Law"

Even assuming that the conduct of Officers Trampas or Newey violated the Fourth or Fourteenth Amendments, plaintiff still cannot meet her burden of showing that the federal rights allegedly violated were clearly established on the date of this incident.  As the Supreme Court explained — when rejecting this Circuit's precedent that the facts of previous cases had to be "materially similar"[73] — "officials can still be on notice that their conduct violates established law *even in novel factual circumstances.*"  *Hope v. Pelzer*, 536 U.S. 730, 771 (2002) (emphasis supplied).

> As we have explained, qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.  For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  *This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful*; *but it is to say that in the light of pre-existing law the unlawfulness must be apparent.*

*Id*. at 739 (emphasis supplied) (citations and internal quotation marks omitted).

This court has been able to find only two cases with facts similar to those that are presented in this action:  *Eubanks v. Lawson*, 122 F.3d 639 (8th Cir. 1997), and

---

[73] *Hope v. Pelzer*, 240 975, 981 (11th Cir. 2001); *see also*, *e.g.*, *Lassiter v. Alabama A & M Univ. Bd. Of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994).

*Baldi v. City of Philadelphia*, 609 F. Supp. 162 (E.D. Pa. 1985).   Both are distinguishable; but even if they were not, two cases, from circuits other than the Eleventh, hardly establishes that the rights Officers Trampas and Newey violated were "clearly established" as a matter of *constitutional* law.

Indeed, assuming plaintiff persuades those jurors who sit in judgment of the results of a process that searches for historical truth that her version of events is the correct account of what occurred, there is little to be said in praise of either Officer Trampas or Officer Newey.   Plaintiff's description shows morally reprehensible behavior. *See Luke* 10: 25-36.  Their actions also exhibit negligence, and they may even be characterized as outrageous, but the conduct does not violate *constitutional* law.   Consequently, defendants are entitled to claim the benefits of qualified immunity.

**D.    Plaintiff's Claims Against the City of Huntsville**

The Supreme Court held in *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), that a municipality may not be held liable under 42 U.S.C. § 1983 on a theory of *respondeat superior*:  in other words, "a municipality cannot be held liable solely because it employs a tortfeasor." *Id*. at 691.  Instead, a municipality may be held accountable in damages for the conduct of a police officer only when the plaintiff shows that execution of the local governmental entity's official "policy" or

"custom" effectively was the cause of the injury complained of. *Id.* at 694. Stated somewhat differently, "[a] local government may be held liable under § 1983 only for acts for which it is actually responsible, 'acts which the [local government] has officially sanctioned or ordered.'" *Turquitt v. Jefferson County*, 137 F.3d 1285, 1287 (11th Cir. 1998) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986)).[74]

Essentially, this issue of whether a municipal government can be held liable for its custom or policy is a question of causation. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (holding that "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue").

Here, plaintiff has failed to present any evidence of a policy or custom adopted by the City of Huntsville that caused or condoned the detention of Mr. Hopson. Accordingly, plaintiff's § 1983 claims against the City of Huntsville will be dismissed.

## E.   Plaintiff's Supplemental State Law Claims

Plaintiff asserted state law claims of negligence and outrageous conduct against all defendants. In cases where the court's jurisdiction is based solely upon a federal

---

[74] *See generally* Kenneth L. Lewis, *Section 1983: A Matter of Policy — Current Overview of Municipal Liability,* 70 Mich. B.J. 556 (1991) ("Thus, municipal liability attaches only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.").

question, the district court has discretion to entertain state claims that are supplemental

to the federal claim.  *See* 28 U.S.C. § 1367(a).[75]  The district court may decline to

exercise supplemental jurisdiction when:

> (1)   the claim raises a novel or complex issue of State law,
>
> (2)   the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)   the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4)   in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  The Supreme Court added a gloss to this statutory language in

*Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988), when observing that

> a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendant [now "supplemental"] state-law claims.

*Id.* at 349-50 (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27

---

[75] 28 U.S.C. § 1367(a) provides that:

> (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

(1966)).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon*, 484 U.S. at 350 n.7.

A district court has discretion to remand a removed case to state court when all federal-law claims have dropped out of the action and only the supplemental state-law claims remain.  *Id.* at 357.  Remand is preferable to dismissal of the state law claims, in order to protect the plaintiff from any applicable statutes of limitations on her state-law claims, and to save her the expense and time of re-filing her papers in state court. *See id.* at 351-53.

Here, the court has dismissed all federal claims over which it has original jurisdiction.  The court declines to exercise supplemental jurisdiction over the remaining state-law claims, which will inevitably deal with complex questions of discretionary function immunity under Alabama law.  Plaintiff's claims of negligence and outrageous conduct will be remanded to the Circuit Court of Madison County, Alabama.

## III. CONCLUSION

An appropriate order dismissing plaintiff's federal claims against defendants,

and remanding her supplemental state law claims to the Circuit Court of Madison

County, Alabama, will be entered contemporaneously herewith.

DONE this 28th day of November, 2005.

_____
United States District Judge